UNITED STATES, Appellant,

v.

Charles S. ALSTON, Appellee.

District of Columbia, Intervenor.

Nos. 90–167, 90–168.

District of Columbia Court of Appeals.

Argued May 8, 1990.

Decided Aug. 13, 1990.

David M. Zlotnick, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Thomas J. Tourish, Linda Mullen, Julieanne Himelstein and David H. Saffern, Asst. U.S. Attys., were on the brief, for appellant.

Samia Fam, Public Defender Service, with whom James Klein, Public Defender Service, was on brief, for appellee.

Leo N. Gorman, Asst. Corp. Counsel, with whom Herbert O. Reid, Sr., Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, and Lutz Alexander Prager, Asst. Deputy Corp. Counsel, were on the Memorandum In Lieu of Brief, for intervenor.

Before ROGERS, Chief Judge, and FERREN and SCHWELB, Associate Judges.

ROGERS, Chief Judge:

The issue in this appeal is whether the Council of the District of Columbia has authority under the District of Columbia Self–Government and Governmental Reorganization Act (Home Rule Act), D.C.Code § 1–229(a) (1987 Repl.), to pass successive, substantially identical emergency acts to preserve the status quo while identical legislation enacted by the Council after two readings is pending before Congress for review. Appellee Charles Alston was charged in two separate multi-count indictments with possession with intent to distribute cocaine while armed, D.C.Code § 33–541(a)(1) (1988 Repl.), and possession of a firearm during the commission of a dangerous offense, D.C.Code § 22–3204(b) (1989 Repl.).[1] In granting his motions to dismiss these charges of the indictments, the trial judges ruled, relying on our decision in *District of Columbia v. Washington Home Ownership Council, Inc. (Washington Home)*, 415 A.2d 1349 (D.C. 1980) (*en banc*), that upon the expiration of the "Law Enforcement Emergency Amendment Act of 1989,"[2] the D.C. Council was without authority to pass a second substantially identical emergency act to maintain the status quo until an identical temporary act took effect following con-

---

1. The offenses charged in Appeal No. 90–167 occurred on April 21, 1989. This indictment also charges Alston with carrying a pistol without a license, D.C.Code § 22–3204(b), possession of an unregistered firearm, D.C.Code § 6–2311(a) (1989 Repl.) and unlawful possession of ammunition, D.C.Code § 6–2361(3) (1989 Repl.).

 The offenses charged in Appeal No. 168 occurred on July 16, 1989. In this indictment Alston is also charged with possession with intent to distribute cocaine, D.C.Code § 33–541(a)(1), carrying a pistol without a license, D.C.Code § 22–3204(a), and possession of an unregistered firearm, D.C.Code § 6–2311(a).

2. The provisions of the "Law Enforcement Emergency Amendment Act of 1989" affect Alston in three ways. First, possession with intent to distribute cocaine (or any felony level distribution or possession with intent to distribute offense) became a "dangerous crime" under D.C.Code § 22–3201. Second, commission of any "dangerous crime" "while armed" was subject to the enhanced penalty provisions of D.C. Code § 22–3202(a). As a consequence, the commission of any such offense became punishable by up to life imprisonment, and, if committed while armed with a firearm, by a mandatory minimum term of five years. Finally, subsection (b) was added to D.C.Code § 22–3204 (carrying a concealed weapon), making it an offense punishable by a mandatory minimum sentence of five to fifteen years to possess a firearm or imitation firearm during the commission of a dangerous crime or a crime of violence.

gressional review.[3]

Appellant, the United States, and intervenor, the District of Columbia, maintain that *Washington Home* is not dispositive since the extension of the period for congressional review of criminal enactments from thirty to sixty days makes impossible the completion of congressional review of Council legislation before expiration of an emergency act. Therefore, they maintain, where the Council has submitted legislation for congressional review and passes a subsequent emergency act to maintain the status quo, the Council is acting within its delegated powers, and is not attempting to circumvent congressional review nor the statutory requirement that permanent legislation may be enacted only after two readings by the Council, the principal evils found in *Washington Home.*

In words we cannot improve upon, the District of Columbia has argued:

The District of Columbia Home Rule Act contains a glaring anomaly: it authorizes the Council to adopt emergency legislation for ninety days, using expedited procedures, but does not permit normal criminal legislation to take effect until weeks or months after the emergency legislation has expired. This is so even when the normal legislation has promptly gone through the two readings required by the Home Rule Act, been signed by the Mayor, and immediately transmitted to Congress for its sixty legislative-day review.

The trial judges in the present appeals held that the District government is powerless to pass a second emergency act in order to bridge the gap that inevitably occurs when the initial emergency act expires before the congressional review period ends. Those holdings leave the local government powerless to cope with threats to public safety lasting more than ninety days, no matter how serious, and no matter that normal legislation to cope with the threat cannot under any circumstances take effect by the nineti-

eth day because of explicit structural limitations in the Home Rule Act. This result is inconsistent with congressional intent that the District government have primary responsibility for legislating in emergencies until Congress has had a full opportunity to review permanent legislation. To the extent that the trial court holdings force Congress itself to enact emergency legislation to bridge the legislative gap it is also inconsistent with Congress's declared intent that the Home Rule Act "to the greatest extent possible, consistent with the constitutional mandate, relieve Congress of the burden of legislating upon essentially local District matters." * * *

Congress should not be assumed to have legislated irrationally. It cannot have authorized the Council to enact legislation to cope with emergencies, and yet have so structured the congressional review period that the legislative solution for the emergency will necessarily inevitably expire before the legislative process for permanent legislation ends. Interpretations of the Home Rule Act that have such bizarre consequences serve no conceivable legislative purpose and are not compelled by the plain language of the Home Rule act or by *District of Columbia v. Washington Home Ownership Council, Inc.*

Neither the Home Rule Act nor the majority opinion in *Washington Home* can reasonably be interpreted to prohibit the Council from enacting an emergency act in order to preserve the statutory status quo while Congress reviews District criminal legislation timely submitted to it. So long as criminal legislation is pending review in Congress at the time a ninety-day emergency act expires, the Home Rule Act should be read as permitting a second emergency act to bridge the procedural gap until the congressional review period ends or until Congress disapproves the proposed regular statute. [footnotes omitted]

---

**3.** The orders dismissed only the "while armed" element of the possession of cocaine with intent to distribute charge.

We agree; a contrary result would make it impossible as a practical matter for genuine emergencies to be effectively resolved on an emergency basis even where, as here, both Congress and the Council favor the substance of the proposed emergency enactment and a lapse would assure incongruous results.

Appellant also maintains that the one day gap between the expiration of the First Emergency Act and the effective date of the Second Emergency Act did not cause the prosecutions in Appeal No. 90–167 to lapse because, under D.C.Code § 49–301 (1987 Repl.) the federal savings statute saves the prosecutions. Again, we agree. Accordingly, the judgments are reversed and the cases are remanded for reinstatement of the charges.

### I

Congress has authorized the Council of the District of Columbia to enact emergency legislation which the Council, by rule, has defined as appropriate in a "situation that adversely affects the health, safety, welfare or economic well-being of a person, for which adherence to the ordinary legislation process would result in delay that would adversely affect those the legislation is intended to protect." D.C.Code § 1–227(c) (1989 Cum.Supp.); Sec. 412(b) of the Rules of Organization and Procedure for the Council of the District of Columbia Council Period VIII (D.C. Council Rules),

36 D.C.R. 294, reprinted as a note to D.C. Code § 1–227. This expedited process frees an emergency act from the burden of two readings by the Council at least thirteen days apart, referral of the bill to a committee, and congressional review, which are required of all permanent legislation. D.C.Code § 1–229.[4] Instead, an emergency act can be passed after one reading, by a vote of two-thirds of the members of the Council, and will become effective immediately upon the signature of the Mayor. Sec. 412 of the D.C. Council Rules. Once in effect, an emergency act is effective for ninety days. D.C.Code § 1–229(a).

In response to our decision in *Washington Home* the Council adopted a third process for approving legislation. Upon a finding by the Council of the existence of an emergency, and the enactment of an emergency bill, the Council may, under this rule-created process, approve on first reading a substantially identical temporary bill in the same legislative session. D.C.Code § 1–227, Sec. 413 of the D.C. Council Rules.[5] Such temporary legislation, like permanent legislation, requires two readings by the Council, but does not require referral to a committee. Like emergency legislation, however, it requires approval by two-thirds of the members of the Council. *Id.* After two readings and approval by the Mayor, the temporary legislation is transmitted to Congress for review.[6] *Id.*

4. D.C.Code § 1–229(a) provides in relevant part:

The Council, to discharge the powers and duties imposed here, shall pass acts and adopt resolutions upon a vote of a majority of the members of the Council present and voting, unless otherwise provided in this Act or by the Council. Except as provided in the last sentence of this subsection [regarding resolutions], the Council shall use acts for all legislative purposes. Each proposed act (other than an act to which § 47–304 [concerning the budget act] applies) shall be read twice in substantially the same form, with at least 13 days intervening between each reading. * * * If the Council determines, by a vote of two-thirds of the members, that emergency circumstances make it necessary that an act be passed after a single reading, or that it take effect immediately upon enactment, such act shall be effective for a period of not [sic] to exceed 90 days. * * *

A reading occurs at a regular legislative meeting of the Council in which the Council members have the opportunity to debate and vote on proposed legislation. *See* D.C. Council Rules, *supra,* §§ 302, 311.

5. Section 413 of the D.C. Council Rules provides that

[i]f the Council finds the existence of an emergency and approves an emergency bill under section 412 [Emergency Legislation], the Council may, at the same legislative session, consider a temporary bill on first reading without committee referral. The temporary bill must be substantially similar to the emergency bill and may remain effective for not more than 225 days.

6. If the Mayor disapproves of a permanent bill, he has ten days to veto the bill. D.C.Code § 1–227(e). If the Mayor vetoes the act, the

The mandatory period for congressional review is the same as that required of permanent legislation; for legislation amending Titles 22, 23 and 24 of the District of Columbia Code, layover in Congress for sixty legislative days, for all other bills, layover in Congress for thirty legislative days, calculated from the time the legislation is transmitted to Congress. D.C.Code § 1–233(c). Once the period of congressional review ends without congressional disapproval, a temporary bill is effective for 225 days. D.C.Code § 1–227, Sec. 413 of the D.C. Council Rules.

Prior to *Washington Home*, it was the Council's practice from time to time, to pass a continuing series of emergency acts, without enacting permanent legislation which requires two readings followed by congressional review. 415 A.2d at 1358, 1366. See note 10, *infra*. Thus, in *Washington Home* the Council had found that the District of Columbia faced a serious shortage of rental housing due to the widespread conversion of rental units to condominium and cooperative properties. 415 A.2d at 1353. In response to this situation the Council passed three successive emergency acts imposing moratoria on rental property conversion. *Id.* at 1350. The court held that the continuing enactment of consecutive, substantially identical emergency acts in response to the same emergency improperly bypassed the requirements of the Home Rule Act for two readings of Council legislation and congressional review. *Id.* at 1359. The District contended that a construction of the Home Rule Act proscribing successive emergency enactments would be unreasonable because, as a practical matter, permanent legislation could not be enacted within ninety days. The Court was unpersuaded, concluding that the District of Columbia had failed to demonstrate a legislative imperative for a second emergency act because it was possible, albeit difficult, for the District government to arrange its procedures

so that permanent legislation would take effect before the expiration of an emergency act after ninety days. *Id.*

After *Washington Home*, in response to the decision of the United States Supreme Court in *I.N.S. v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (one-House veto held unconstitutional), Congress in 1984 increased the period of congressional review of Council legislation amending Titles 22, 23 or 24 of the District of Columbia from thirty to sixty legislative days. D.C.Code § 1–233(c). The instant case is the first to reach this court which requires us to consider the relationship, if any, between this change in congressional review procedures and the Council's power to enact emergency legislation.

In 1989, in response to the escalating crime rate in the District of Columbia, the Council passed the "Law Enforcement Emergency Amendment Act of 1989" (First Emergency Act) on March 7, 1989. See Part III, *infra*. The Act was signed by the Mayor on March 15, 1989, and expired on June 12, 1989. At the same legislative session, on March 7, 1989, the Council passed on first reading the "Law Enforcement Temporary Amendment Act of 1989" (Temporary Act), which was identical to the First Emergency Act. The Council passed the Temporary Act on second reading April 4, 1989. It was signed by the Mayor on April 17, 1989, and transmitted to Congress for the 60–day layover period on April 19, 1989. The Temporary Act became effective on July 28, 1989, and expired on March 10, 1990. After the Temporary Act was in effect, the Council adopted permanent legislation, the "Law Enforcement Permanent Amendment Act of 1989" (Permanent Act), which was identical to the Emergency and Temporary Acts; the Permanent Act was signed by the Mayor on December 21, 1989, and became effective following congressional review on May 8, 1990.[7]

Council may override the Mayor's veto with a two-thirds of the members of the Council. *Id.*

**7.** In anticipation of a gap between the expiration of the Temporary Act and the effective date of the Permanent Act, the Council passed a general savings clause statute in order to prevent prosecutions from abating. *See* "D.C. Statutory Savings Provision Emergency Act of 1990," D.C. Act 8–153, 37 D.C.Reg. 1069; "D.C. Statutory Savings Provision Temporary Act of 1990," D.C. Act 8–156, 37 D.C.Reg. 1476.

Because the Temporary Act was still undergoing congressional review when the First Emergency Act expired on June 12, 1989, the Council passed a second emergency act, "Law Enforcement Continuing Emergency Amendment Act of 1989" (Second Emergency Act), on June 13, 1989, which was identical to the first emergency act. The Second Emergency Act was signed by the Mayor on June 14, 1989. Appeal No. 90–167 involves an indictment charging appellant Alston with possession with intent to distribute cocaine while armed and unlawful possession of a firearm during commission of a dangerous offense while the First Emergency Act was in effect. Appeal No. 90–168 involves similar drug and gun charges while the Second Emergency Act was in effect.

## II

■ In *Washington Home*, the issue before the court was whether the D.C. Council may circumvent congressional review, as well as the second reading requirement, by enacting substantially identical successive emergency legislation when permanent legislation could reasonably be expected to become effective within the lifetime of an emergency act. The court held that the Council was without authority to sidestep these statutory requirements by passing a successive, substantially identical emergency act addressing the same emergency. 415 A.2d at 1359. The court rejected the District government's argument that Congress intended for there to be two alternative legislative tracks, one for permanent legislation requiring a second reading and congressional review and a second for an unbroken chain of successive emergency acts.

We therefore hold that when the Council, by a two-thirds vote after a single reading, enacts legislation in response to emergency circumstances, as authorized by D.C.Code 1979 Supp., § 1–146(a), that

act 'shall be effective for a period of not to exceed ninety days,' *id.*, and the Council has no authority to pass another substantially identical emergency act in response to the same emergency.

*Id.* at 1359.

The court premised its interpretation of congressional intent underlying the delegation of emergency powers to the D.C. Council on the legislative scheme viewed as a whole, most particularly on the circumstances that the simultaneous adoption of permanent and emergency legislation could assure Council members of "a reasonable expectation" that the permanent legislation could be effective within ninety days of the first reading. *Id.* at 1353, 1357. In support of its holding the court stated that the District had not demonstrated that a ninety day limit on emergency legislation was "incompatible with the need for a responsive legislation process in the District of Columbia." *Id.* at 1359. The timetable anticipated by the Home Rule Act was not, in the court's words, "so workable that we can infer Congress intended (by virtue of the layover provision or otherwise) to permit consecutive emergency acts." *Id.* at 1352. Indeed, the court set forth a time schedule demonstrating that timely permanent legislation could be put in effect before the emergency legislation expired. *Id.* at 1357 n. 16. Ordinarily, therefore, the court anticipated, the District government would be able to adopt permanent legislation that would become effective during the ninety-day period in which an emergency act was effective. The court referred to the remarks of Congressman Rees indicating that Congress contemplated that there would be no gap between emergency and permanent legislation; the Congressman had expressed his opposition to "chain hanky-panky".[8] Further, the court noted that reasonable alternatives to successive identical emergency legislation were avail-

8. The court interpreted Congressman Rees' comment about "chain hanky-panky" to reflect a general concern about overuse of the emergency power in ways that bypass the second reading rule since his comment was made at a time when the home rule legislation did not include a requirement for congressional review of the

able to the Council.[9] *Id.* at 1357. Four judges expressed concern that otherwise a substantial body of laws "might be effectively insulated from both congressional and judicial scrutiny," citing opinions of the Corporation Counsel that the Council was without authority to avoid the second reading requirement and congressional review by stringing together successive identical emergency acts.[10] *Id.* at 1365 (Gallagher, J., concurring).

Although *Washington Home* could not anticipate or address the Supreme Court's later decision in *Chadha, supra,* 462 U.S. 919, 103 S.Ct. 2764, or the consequent amendment to the congressional layover provisions of the Home Rule Act, it did leave open the possibility that there might be circumstances when the Council could, consistent with its delegated powers under the Home Rule Act, enact a second emergency act which was identical to the first emergency act. Specifically, the court stated in footnote 20:

> we premise our analysis of the District's "structural" argument on an assumption that Congress is in session, such that the 30–day layover period can run interrupted only by weekends and holidays. We do not foreclose the argument that a congressional recess after enactment but before the 30–day period has run may

create a different emergency permitting a second, consecutive emergency act.

*Washington Home,* 415 A.2d at 1359 n. 20.

At the time of *Washington Home,* the congressional review period for all Council legislation was thirty legislative days. In 1984, this changed. Compromising between the position of the United States Department of Justice, which proposed that the Council should have no authority to enact any criminal legislation or that the U.S. Attorney General determine the scope of the Council's authority, and the position of the District of Columbia government, which urged that the congressional layover period should be reduced, if not eliminated, Congress increased from thirty days to sixty days the layover period for Council legislation amending Titles 22, 23 and 24 of the District of Columbia Code, and provided that Council legislation could be disapproved only by a majority vote of both houses of Congress. Consequently, as the District of Columbia points out, it is no longer possible with the requirement for a sixty legislative day layover period for the Council to avoid a gap between the expiration of emergency legislation and the effective date of legislation undergoing congressional review unless it enacts a second emergency act.[11] In this sense, the Home

---

acts passed by the D.C. Council. *Id.* at 1355 & n. 13.

**9.** The court suggested that the Council could adopt abbreviated hearing procedures on those occasions when it declared an emergency "in order to assure that a second reading and passage could occur not long after 13 days from the first reading." *Washington Home, supra,* 415 A.2d at 1357.

**10.** The Corporation Counsel noted, further, the importance of having the D.C. Council identify the necessity for emergency legislation. In *Washington Home,* the parties had stipulated to 84 instances of the successive use of emergency powers. Judge Gallagher, writing for the plurality, noted that the emergency legislation dealt "with such dubious social emergencies as: regulations relating to ice cream vendors, public alley closings, rental vehicle tax, merit personnel legislation, senior citizen residences sales tax on meals exemptions, and household and dependent care services deduction," 415 A.2d at 1366 (Gallagher, J. concurring) and further, that in some instances, emergencies had been de-

clared for the same problem every ninety days for two to three years. *Id.*

**11.** The District of Columbia, in its Memorandum in Lieu of Brief, effectively refutes appellee's contention that it remains possible for congressionally reviewed legislation to become effective before the first emergency act expires. "Using the most expeditious processing permitted by the Home Rule Act," the District points out that "it still would take at least 98 calendar days from the time a bill is presented to the Council, receives a second reading (thirteen days), is signed by the Mayor (immediately), is transmitted to Congress (also immediately), and awaits the end of the review period (eighty-four days, including intervening Saturdays and Sundays)." The only way to achieve the result suggested by appellee is for the Council to postpone the enactment of emergency legislation until after the regularly enacted legislation (with two readings by the Council) has been submitted to Congress for review. This is contrary to the plain reading of the Home Rule Act's authorization to the Council to enact emergency legislation to take effect immediately.

Rule Act has become "unworkable" under the analysis in *Washington Home* since the status quo of emergency legislation could not be maintained while criminal laws are undergoing their sixty-day review by Congress.

The *en banc* court in *Washington Home*, which the trial judges viewed as dispositive, was presented with an assertion by the D.C. Council of broad power to bypass congressional review and the second reading requirement by enacting successive emergency acts for the same emergency. *See id.* at 1353–54. The court was not presented with the much narrower claim of the Council's authority to enact a second emergency act to provide an extension of the law in order to avoid a lapse due to the time required for the completion of congressional review. While the issues on appeal are not without difficulty, the language of the holding in *Washington Home* must be read in context,[12] and clearly, as demonstrated by the inclusion of footnote 20 in that decision, the court did not establish a rigorous rule that under no circumstances could the D.C. Council enact a second emergency act. *Washington· Home* did not hold that the Home Rule Act prohibited the Council from enacting a consecutive, substantially identical emergency act under all circumstances, nor preclude an interpretation of congressional intent consistent with the use of the Council's emergency power to fill a statutory gap arising from the congressional review requirement. *See id.* at 1359 n. 20. The trial judges concluded that the Council's emergency power did not extend to circumstances arising in the normal legislative process, because such circumstances, in their view, could not constitute a different emergency. However, it is well known that congressional recesses, referred to in footnote 20 as possibly creating a different emergency, occur with substantial frequency and, therefore, the difference between the two situations is more one of degree than of kind. Consequently, the court was not suggesting, as the trial judges concluded, that a second emergency act was precluded if designed to respond to the normal legislative process.

Nothing in the language of the Home Rule Act or its legislative history denies the D.C. Council the authority to enact a second emergency act. The Act does not provide that the Council may enact only one emergency act in response to one emergency. The Act grants the Council the power to pass an emergency act and then provides that "such act shall be effective for a period of not to exceed 90 days." D.C.Code 1–229(a). In *Washington Home*, the court acknowledged that the District government's interpretation of the ninety-day limitation on the Council's emergency powers under D.C.Code § 1–229(a), as applying only to the particular emergency and not broadly to the substantive provision of the emergency legislation, was "not wholly implausible." *Id.* at 1353–54. Nor did the court view its interpretation of congressional intent to be inconsistent with that interpretation. *See id.* at 1359 n. 20. *Washington Home* did not interpret the Council's emergency powers to be limited

There also is nothing in the legislative history to suggest that Congress intended such delayed emergency responses by the Council.

In addition, we agree with the District of Columbia that interpreting § 602(a) of the Home Rule Act to refer only to calendar days in order to avoid a statutory gap would be contrary to the congressional purpose in extending the review period from thirty to sixty days and ignore legislative history that only legislative days are to be counted. *See* S.Rep. No. 635, 98th Cong., 2d Sess. 5, 7.

**12.** In *Kraft v. Kraft*, 155 A.2d 910 (D.C.1959), the court pointed out that:

It is well to remember that significance is given to broad and general statements of the law only by comparing the facts from which they arise with those facts to which they supposedly apply.

155 A.2d at 913. *See also Armour & Co. v. Wantock*, 323 U.S. 126, 132–33, 65 S.Ct. 165, 168, 89 L.Ed. 118 (1944), where the Supreme Court aptly stated:

It is timely again to remind counsel that words of our opinions are to be read in the light of the facts of the order under discussion. To keep opinions within reasonable bounds precludes writing into them every limitation or variation which might be suggested by the circumstances of cases not before the Court. General expressions transposed to other facts are often misleading.

to the enactment of only one emergency act on a single subject, but rather rejected the view that successive emergency acts for the same emergency was a permissible alternative legislative track. In view of the foregoing analysis of the legislative scheme under the Home Rule Act in *Washington Home*, we conclude that when the Council has not bypassed the second reading and congressional review requirements, the ninety-day limitation on the Council's authority to enact an emergency act is properly viewed, as part of the legislative scheme, as applying only to the act and not to its substance.

Further, no one has cited to us, and we have not found, a statement by any member of Congress that the Home Rule Act does not under any circumstances authorize the Council to enact a second emergency act. At no time since its enactment in 1973 has Congress amended the provision of the Home Rule Act authorizing the Council to enact emergency legislation. Nor has it imposed additional limitations on the authority of the Council to enact emergency acts when it amended the Home Rule Act in 1978,[13] and later in 1984 in response to *Chadha, supra*, 462 U.S. 919, 103 S.Ct. 2764. Nor do we have any cause to conclude that when Congress extended the congressional review period to sixty days it acted in an irrational manner or intended irrational results, particularly when a matter as important as public safety is at issue. In *Washington Home*, the court described the layover period for congressional review as "an orderly way for Congress to carry out its constitutional responsibility to legislate for the District [of Columbia]." 415 A.2d at 1352. To conclude otherwise when Congress has extended the review period would mean that a public safety emergency could only be addressed for ninety days since Congress, given its full national agenda, would be virtually unable to pass legislation itself before the emergency act expired, absent an emergency of national security proportions. See note 13, *supra*.

In the instant case, unlike *Washington Home*, the court is not presented with an attempt by the Council to avoid congressional review, and the second reading requirement, by enacting successive emergency acts. This is obviously not a case of "chain hanky-panky." The Council passed the First Emergency Act simultaneously with the first reading of the Temporary Act, which was thereafter passed at a second reading and subsequently sent to Congress for review. At the same time the Council began the process of enacting the legislation in permanent form. After two readings, following the referral of the proposed legislation to a committee of the Council, the Permanent Act also was submitted to Congress for review. Clearly, the purpose of the second reading requirement—notice of the Council's intended legislative action—was fully served, as was the requirement for congressional review.

When Congress amended the Act in 1984 it did not amend the provision granting the Council the power to enact emergency legislation. But it did create a practical problem unanticipated by Congress in 1973 since a gap in some criminal emergency legislation would now be unavoidable if the Act were construed as authorizing only a

13. Congress passed several clarifying amendments to the Home Rule Act in 1978 in response to the recommendations of a Presidential Task Force on the District of Columbia. The amendments were designed to eliminate provisions that created unreasonable hardships on the local government and that were unnecessary, including unnecessary federal intrusion in decisions of purely local concern. H.R.Rep. No. 1104, 95th Cong., 2d Sess. 2; S.Rep. No. 1291, 95th Cong., 2d Sess. 2. *See* District of Columbia Self–Government and Governmental Reorganization Act, Pub.L. 95–526, 92 Stat. 2023 (1978).

Of interest here, Congress noted in 1978 that "[t]he unpredictability [of when an act passed by the Council will become law] has forced the District to enact an inordinate amount of temporary (90–day) "emergency legislation" that requires no congressional review and takes effect immediately." H.Rep. No. 1104 at 2 (noting in particular the Condominium Act of 1976 (D.C. Act 1–151), where seven months elapsed before the act became law). In response, Congress amended the congressional review provisions. It redefined "legislative days" from days when both houses of Congress were in session, excluding Saturdays, Sundays and holidays, to days when one house of Congress was in session, but additionally excluded from the calculation recesses or adjournments over three days.

single emergency act. The rational way to avoid this problem is to allow two successive emergency acts when temporary or permanent legislation has been submitted for congressional review. While legislative intent in this respect is unclear, nothing in the language of the Act or its legislative history indicates that Congress meant to proscribe successive emergency acts in these circumstances. Likewise, *Washington Home*—although proscribing the use of successive, identical emergency acts as means to avoid congressional review—did not proscribe successive emergency acts under all circumstances. Given the absence of clear legislative intent, the court must read the statute in a manner most likely to avoid an irrational result. *Rosado v. Wyman*, 397 U.S. 397, 415, 90 S.Ct. 1207, 1219, 25 L.Ed.2d 442 (1970) (statute must be construed with premise that Congress acted logically and rationally), *cited in Berkley v. United States*, 370 A.2d 1331, 1332 (D.C.1977) (*per curiam*); *Davidson v. D.C. Board of Medicine*, 562 A.2d 109, 113 (D.C.1989).

In sum, the imperative to allow a second successive emergency act is clear now that Congress has doubled the length of congressional review for amendments to Titles 22, 23, and 24, and the District government can no longer arrange its procedures to avoid a statutory gap. Thus, and under the analysis in *Washington Home*, 415 A.2d at 1352, the only reasonable inference is that Congress did not intend to prevent

consecutive emergency acts to make the layover period "workable." Consequently, in the absence of a statutory prohibition and a reasonable expectation that permanent legislation can become effective within the lifetime of an emergency act, we hold that the Council did not exceed its emergency legislative authority in adopting the Second Emergency Act.[14] The questions remain, however, whether the Second Emergency Act was a valid exercise of the Council's emergency powers and whether the prosecutions in Appeal No. 90–167 lapsed as a result of the one-day gap between the first emergency act and the temporary legislation.

### III

The Home Rule Act requires that in order to enact emergency legislation the Council must find that emergency circumstances exist which require immediate legislative action. D.C.Code § 1–229(a). In support of the First Emergency Act, the Council found that in 1988 the District of Columbia had experienced "a record number of homicides committed with a firearm," and that in 1989 the rate of those crimes "is substantially greater than in 1988." Res. 824, D.C. Council (March 7, 1989). The Council further found that the increase in the rate of homicides and assaults with a firearm "could be alleviated if the District of Columbia courts could hold a person in pretrial detention when the court finds that there is a substantial probability

---

**14.** The trial courts, citing Judge Gallagher's opinion in *Washington Home*, suggested that fixing the gap is a legislative rather than a judicial function. We conclude it is a core judicial function to decide whether the Council has the authority to preserve the status quo by enacting a second emergency Act. These appeals arise because of the gloss put on the statutory language authorizing the Council to enact emergency legislation in *Washington Home*, and not as a result of the language of the Home Rule Act itself. *See* 415 A.2d at 1349 ("the statutory language is not conclusive"). The responsibility rests with this court to reconcile its interpretation of congressional intent when confronted with unanticipated circumstances.

Of course, had Congress envisaged the gap problem that is presented in these appeals when it extended the congressional review period to sixty days, it is likely, based on the available

evidence, that Congress would have responded in a manner consistent with its decision not to withdraw from the Council the authority to enact criminal laws and the authority to enact emergency acts. In 1978 Congress was aware of the Council's successive enactment of emergency acts, and yet did not withdraw or limit that authority. Congress surely is concerned about public safety in the Nation's capital, and is well aware that the congressional legislative process is not designed to be immediately responsive to local emergencies requiring legislative amendment. D.C.Code § 1–201(a). *See, e.g.,* District of Columbia Police Authorization and Expansion Act of 1989, Pub.L. No. 101–223, 103 Stat. 1901 (law, regarded as urgent, authorizing appropriations for 700 additional police officers for the District of Columbia Metropolitan Police Department, introduced March 20, 1989, and effective December 12, 1989).

that the person possessed a firearm while committing a felony offense." *Id.* Accordingly, the Council concluded that these circumstances "constitute emergency circumstances making it necessary that the Law Enforcement Emergency Amendment Act of 1989 be adopted after a single reading." *Id.* The Act amended the terms "dangerous crime" and "crime of violence" to include new crimes, enhanced the penalties of crimes involving dangerous weapons, and, for purposes of pretrial detention, created "a rebuttable presumption that no ... combination of conditions of release will reasonably assure the safety" of the community where a judicial officer finds there is a substantial likelihood that the individual committed a dangerous crime or crime of violence while armed. Law Enforcement Emergency Amendment Act of 1989, D.C. Council (March 15, 1989).

 Determining whether the D.C. Council exceeded its authority under the Home Rule Act is a question of statutory interpretation which requires the court to focus on the intent of Congress. *Washington Home*, 415 A.2d at 1351. In reviewing the Council's determination of what constitutes an emergency, however, the court is deferential. *A.F.G.E. v. Barry*, 459 A.2d 1045, 1051 (D.C.1983). Upon review of the plain language of the Home Rule Act and its legislative history, we find no basis on which to hold that the Council abused its authority in determining that an emergency existed necessitating emergency legislative action.

In the resolution in support of the Second Emergency Act, the Council found that the same public safety concerns as required enactment of the First Emergency Act and the Temporary Act warranted an extension of the authorization to use preventive detention and to impose enhanced penalties for certain offenses. In addition, the Council found that the forty-five-day gap between the expiration of the First Emergency Act on June 12, 1989, and effective date of the Temporary Act on July 27, 1989, constituted additional emergency circumstances; that is, the continued concern about public safety necessitated con-

tinuation of those protections while Congress reviewed the temporary act. This additional circumstance, the Council concluded, required adoption of the Second Emergency Act after a single reading. Res. No. 8–63, D.C. Council, June 13, 1989.

The nature of the two emergency acts is thus distinct in one respect. The First Emergency Act addressed the Council's determination that public safety required immediate amendments to provisions of the criminal law. The Second Emergency Act reflected the Council's determination that the protection afforded to the public by its First Emergency Act would be adversely affected, because of the length required for completion of congressional review, unless the amendments to the criminal laws remained in effect. The emergencies are identical in the sense that the public safety finding of the Council continued to be the same as before. But the emergencies addressed by the Council differ because the need for the second emergency act arose from the length of the congressional review period and, therefore, was necessary to maintain the status quo following the expiration of the First Emergency Act before the effective date of the Temporary Act after congressional review. This circumstance was neither present in *Washington Home* nor the concern of those wary of "chain hanky-panky." *Washington Home* signaled in footnote 20 that the court's interpretation of congressional intent did not preclude the possibility of there being "a different emergency permitting a second, consecutive emergency act" when the mechanics of the congressional review process itself interfered with the completion of that review in the most expeditious manner. 415 A.2d at 1359 n. 20.

Absent any indication by Congress that emergency acts amending D.C.Code Titles 22, 23, and 24 should not continue to be in effect until temporary or permanent legislation can become effective following congressional review, or that the Council should not have the authority to maintain the legislative status quo during the congressional review period, the common sense understanding of congressional purpose in authorizing the Council to enact

emergency legislation persuades us that the Council's enactment of the Second Emergency Act was within its legislative authority. Irrational results would otherwise result, since the penalties for similarly situated persons would differ depending on when an individual was arrested. A person sentenced for a firearms offense while the First Emergency Act was in effect would be subject to a mandatory minimum of five years' imprisonment (without the right to parole, probation or suspension of sentence) and up to fifteen years imprisonment, while a person sentenced under the unamended code for the same offense would not face a mandatory minimum sentence at all and could be sentenced only to a maximum of ten years' imprisonment (without restriction of parole, probation or suspension of sentence). Irrational results also inhere in the fact that a person arrested when the Emergency Act was in effect would be subject to being preventively detained under a rebuttable statutory presumption that no condition of release would assure public safety.

Congress' stated purpose in enacting the Home Rule Act was "to the greatest extent possible, consistent with the constitutional mandate, [to] relieve Congress of the burden of legislating upon essentially local District matters." D.C.Code 1–201(a) (1987 Repl.). In so doing, the court has held that Congress intended to delegate to the Council " 'all rightful subjects of legislation within the District.' " *McIntosh v. Washington*, 395 A.2d 744, 750 n. 11 (D.C.1978) (quoting D.C.Code § 1–124 (1978)). The only "subjects of legislation" excluded from the Council's legislative authority are those expressly excepted under section 602 of the Home Rule Act. D.C.Code § 1–233 (1987 Repl.). The Home Rule Act authorizes the Council to pass emergency legislation for ninety days and does not prohibit the Council from enacting criminal laws by emergency act.[15] Congress also has not

prohibited the Council from enacting more than one emergency act.

Stated another way, under the Home Rule Act, a successive emergency act that is required in order to make a first emergency act meaningful and to avoid unjust consequences not intended by the D.C. Council or Congress is not inherently suspect. Despite the Council's former practice presented to the court in *Washington Home*, in which the Council had adopted numerous successive emergency acts without passage of any similar legislation subject to congressional review,[16] Congress has never acted to restrict the Council's emergency act powers. In addition, the Council's response to *Washington Home*, establishing the temporary act procedure, may well have been viewed by members of Congress and others as an effective resolution by the Council of the problems encountered in *Washington Home, supra*, thereby eliminating the need for further congressional action.

Unlike situations where a state government acts contrary to the position of the federal government, the institutional parties, Congress and the District of Columbia, as well as the institutional actors, the local legislature and the local prosecutor, all agree that the new laws should stay in effect. The Congress has sought to relieve itself of the burden of enacting local legislation and has not disapproved the temporary or permanent legislation at issue in these appeals. The District of Columbia has sought, by amendment to the D.C. Council rules and otherwise, to conform its legislative process in a manner consistent with the congressional delegation of legislative authority, as interpreted by this court in *Washington Home*. The Council, as elected representatives of the citizens of the District of Columbia, has acted to address concerns about public safety by enacting legislation which Congress has had

**15.** There is nothing in the language of the Home Rule Act or its legislative history to suggest, as appellee argues, that Congress intended that amendments to the criminal law could not be made by emergency act of the D.C. Council. *See McIntosh v. Washington,* supra, 395 A.2d at

751–52 (legislative history of four-year moratorium on amendments to Titles 22, 23 and 24 of the D.C.Code until the D.C. Law Revision could be established).

**16.** See note 10, *supra.*

the opportunity to review. The United States Department of Justice, as the local prosecutor, seeks to assure a rational prospective process by enforcing the criminal laws without producing irrational results of a statutory lapse, which, insofar as we can determine, would be completely unintended. Moreover, the court has not held that a second emergency act is beyond the Council's authority when the gap problem arises as a result of the length of the congressional review period.

Accordingly, we hold that where the Council has determined that emergency legislation should remain in effect for more than ninety days and taken all reasonable actions to assure that its legislation, in a form enacted after two readings, is presented to Congress for review without unreasonable delay, the Council acts within its legislative authority under the Home Rule Act when it enacts a successive substantially similar emergency act in order to maintain the status quo during the congressional review period. Hence, the Second Emergency Act is a valid enactment.

### IV

■ The final issue is whether the one day gap between the expiration of the First Emergency Act on June 12, 1989, and the effective date of the Second Emergency Act on June 14, 1989, caused the prosecutions in Appeal No. 90–167 to abate. *Warden, Lewisburg Penitentiary v. Marrero (Marrero)*, 417 U.S. 653, 660, 94 S.Ct. 2532, 2536, 41 L.Ed.2d 383 (1974) (repeal or expiration of a statute requires the termination of prosecutions begun under that statute, but not yet completed at the time of its expiration or repeal); *Bell v. Maryland*, 378 U.S. 226, 230–31, 84 S.Ct.

1814, 1817, 12 L.Ed.2d 822 (1964); *United States v. Chambers*, 291 U.S. 217, 223, 54 S.Ct. 434, 435, 78 L.Ed. 763 (1934). The D.C. Council did not include a savings clause in the First Emergency Act and in 1989 the District of Columbia did not have a general savings statute.[17] On the other hand, Congress clearly has that authority to provide for the nonabatement of District of Columbia statutes. *Cf. Chambers, supra*, 291 U.S. at 225, 54 S.Ct. at 437.

The general federal savings statute, 1 U.S.C. § 109, provides

[t]he repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability. The expiration of a temporary statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the temporary statute shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability.

The statute specifically prevents the abatement of prosecutions begun under a temporary statute that expires before the conclusion of those prosecutions, unless provided in the statute. D.C.Code § 49–301 (1987 Repl.), enacted by Congress, extends this savings statute to District of Columbia laws.[18]

---

**17.** See note 7, *supra.*

**18.** D.C.Code § 49–301 (1987 Repl.) provides:

The common law, all British statutes in force in Maryland on February 27, 1801, the principles of equity and admiralty, all general acts of Congress not locally inapplicable to the District of Columbia, and all acts of congress by their terms applicable to the District of Columbia and to other places under the jurisdiction of the United States, in force in the District of Columbia on March 3, 1901, shall remain in force except so far as the

same are inconsistent with or are replaced by, some provision of the 1901 Code.

Appellee's contention that this section applies only to acts of Congress "in force in the District of Columbia on March 3, 1901" is misplaced. *Id.* The statute specifically includes five areas of law: the common law, all British statutes in force in Maryland on February 17, 1801, the principles of equity and admiralty, general acts of Congress not locally applicable to the District, and finally, all acts of Congress by their terms applicable to the District in force on

Heretofore the court has applied the general federal savings clause to provisions of the D.C.Code, but only to those which had been passed by Congress pursuant to its authority under Article I, Section 8, Clause 17 of the United States Constitution. *See Estep v. Construction General, Inc.*, 546 A.2d 376 (D.C.1988) (D.C. Worker's Compensation Act of 1928); *O'Connell v. Maryland Steel Erectors, Inc.*, 495 A.2d 1134 (D.C.), *cert. denied*, 475 U.S. 1066, 106 S.Ct. 1378, 89 L.Ed.2d 603 (1986) (same); *Quick v. District of Columbia*, 71 A.2d 771 (D.C.1950) (D.C. Rent Act, § 45–1610(b) (1940 ed.)). However in applying the federal savings statute, the court held that it was applicable not because the legislation at issue has been enacted by Congress, but because Congress chose to make its general laws applicable to the District of Columbia unless those laws were "locally inapplicable," D.C.Code § 49–301, or "inconsistent with some other provision of the District of Columbia Code." *United States v. Brown*, 422 A.2d 1281, 1283 (D.C.1980). In *O'Connell v. Maryland Steel Erectors, Inc.*, *supra*, the court expressly held that the general federal savings clause is an act of Congress applicable to the District of Columbia. 495 A.2d at 1142 n. 16. *Accord Railco Multi–Const. Co. v. Gardner*, 564 A.2d 1167, 1171 (D.C.1989); *Estep, supra*, 546 A.2d at 378. Moreover, the acts of Congress in our prior decisions were enacted by Congress pursuant to its constitutional responsibility for the District of Columbia; in enacting the Home Rule Act, Congress has delegated legislative powers under Article I, Section 8, Clause 17 to the D.C. Council.

■ The common law doctrine of abatement establishes a presumption that abatement was the purpose of the legislature in the absence of a contrary intent. *See Marrero, supra*, 417 U.S. at 659–60, 94 S.Ct. at 2536–37. The Federal Savings clause shifts that presumption, providing that penalties incurred under a temporary statute will not abate upon the statute's

March 3, 1901. The clause "in force in the District of Columbia" modifies only the last category of the statute and not "all general acts of Congress not locally applicable to the District of

expiration, unless the statute expressly so provides. 1 U.S.C. § 109. The First Emergency Act did not expressly provide for the abatement of prosecutions under it upon its expiration.

Accordingly, we hold that the federal savings provision of 1 U.S.Code § 109 applies to emergency acts of the D.C. Council and preserved appellee's prosecution for offenses under the First Emergency Act. The cases in this appeal are remanded to the trial court with instructions to reinstate the dismissed charges in accordance with this opinion.

*Reversed and remanded.*

Columbia". *See O'Connell v. Steel Erectors, Inc.*, 495 A.2d 1134, 1142 n. 16 (D.C.), *cert. denied*, 475 U.S. 1066, 106 S.Ct. 1378, 89 L.Ed.2d 603 (1986).