**STATE of Missouri ex rel. Robbie TYLER et al., Respondents,**

**v.**

**Ilus W. DAVIS et al., Appellants.**

No. 54655.

Supreme Court of Missouri
En Banc.

July 30, 1969.

———◆———

Michael C. Boerner, Kansas City, for respondents.

Herbert C. Hoffman, City Counselor, Aaron A. Wilson, Jr., Deputy City Counselor, Kansas City, Harry P. Thomson, Jr., Sp. Associate Counsel, Shughart, Thomson & Kilroy, Kansas City, for appellants.

FINCH, Judge.

This is an appeal from a judgment issuing a peremptory writ of mandamus requiring the Mayor and Councilmen of Kansas City to pass an ordinance calling a

referendum election involving four utility tax ordinances enacted by the Council as emergency measures on September 9, 1968. We reverse.

We have jurisdiction. The record affirmatively shows that the four ordinances in question would provide taxes which would approximate $4,800,000 on the basis of a twelve months period. The ordinances were to be effective immediately and would terminate on June 30, 1969, so that the taxes involved were for a period of a little less than ten months. The taxes provided for have been collected. The referendum, if ordered, would delay the effective date of the ordinances until after a favorable referendum vote. Consequently, the taxes collected in the interim, including $300,000 which was paid under protest and impounded, would be subject to refund if the action of the trial court is affirmed. It clearly appears, therefore, that the loss in money value to the respondents would be greatly in excess of $15,000. Cooper v. School District of Kansas City, Mo., 362 Mo. 49, 239 S.W.2d 509 [3, 4].

The decisive issue presented on this appeal is whether these ordinances were emergency measures for the immediate preservation of the public peace, property, health and safety, and hence excepted from the referendum provisions of the Charter of Kansas City. We have determined that they were emergency measures. Consequently, we need not consider the other issues raised, including whether mandamus is an appropriate remedy, whether the referendum petitions were sufficient and whether the City Clerk acted arbitrarily and capriciously in failing to certify said referendum petitions to the City Council.

We state only such facts as are necessary to a determination of the issue of whether the ordinances were emergency measures.

On Sunday, April 7, 1968, there was a memorial march from the inner-city district to the Liberty Memorial for a service in honor of the late Dr. Martin Luther King. The march and service were orderly, but that night there were scattered fires in the city in which arson was suspected. During the evening of April 8, additional fires, apparently of incendiary origin, broke out.

As a result of these occurrences, the Chief of Police called a meeting of his commanding officers at 7:30 a. m. on April 9 to discuss developments and the unrest and tension which existed. While they were in session, trouble developed at Lincoln High School, resulting in a march which was joined by other persons and ended downtown at the City Hall. Ultimately, the police used tear gas to disperse the crowd and full-scale rioting developed in the city. Sniping, incendiary fires and looting occurred.

The Governor sent in State Highway Troopers and 2300 members of the National Guard to work with the Kansas City Police Department and personally went to Kansas City to observe the situation. Ultimately, the trouble began to subside and by April 14 things again were fairly quiet.

During the riot, six persons were shot and killed. Numerous others were wounded by police officers and by unknown persons, and more than 1000 people were arrested. Property damage was extensive.

As a result of the rioting, the Police Department incurred extra expense, primarily overtime, of $200,000. The department did not have funds in its budget for this expense and had to request an extra appropriation for that amount. The Council provided the sum out of the city's Contingency Fund.

The state of unrest and tension continued after the rioting had ended and in the months that followed there were some subsequent incidents at City Hall. In August there was a confrontation at Wayne-Minor Housing Project, followed by a march on City Hall, but rioting did not again erupt. During this same period, various militant organizations, such as the Black Panthers

and Soul, Inc., became active. Numerous citizens, including the Mayor, Chief of Police, various Councilmen and other officials, testified that a high degree of tension continued to exist in the city up to and including September 9, 1968, the date of the enactment of the utility tax ordinances in question.

On May 4, 1968, the Mayor appointed a five-member commission to investigate the causes for the riots and to make recommendations on what could be done to prevent such occurrences in the future. That commission, headed by David R. Hardy, made an extensive investigation and submitted its report on August 15, 1968, making numerous recommendations, some of which will be referred to herein subsequently.

Kansas City operates on a fiscal year commencing on May 1. Its charter requires that its annual budget be adopted not later than ten days before the start of the fiscal year. Consequently, the City Council, on April 19, 1968, adopted its budget for the fiscal year 1968–1969. That budget had been developed over a period of months and had been completed for action by the Council prior to the time when the riots broke out in Kansas City.

The 1967–1968 budget had provided funds for the Police Department which allowed 940 uniformed policemen, and that was the size of the force at the time the riots occurred. However, due to shortage of funds, the 1968–1969 budget provided an amount for the Police Department which necessitated lowering the number of uniformed policemen to 900.

Following the riots, the city officials determined that it would be unwise at that time to reduce the number of uniformed policemen. They directed Chief of Police Kelley to continue the police force at the same level, even though the budget for the department provided funds which would support only a force of 900 uniformed policemen for the year 1968–1969.

The department maintained its uniformed strength at substantially that level for the rest of the spring and much of the summer, but when additional funds were not forthcoming it ceased filling vacancies as they occurred. As a result, its strength had dropped to 922 uniformed policemen by September 9. Furthermore, since the department had continued to operate at a higher level than budgeted without receiving additional funds, it was going to be necessary to drop further to 880 uniformed men in order to operate within the budget figures for the year. It also was announced that it would be necessary to discontinue the Police Academy which trained new recruits for the department.

Meanwhile, the Hardy report pointed out that Kansas City had 1119 fewer police officers than the City of St. Louis, although it had 316 square miles of territory compared with 62 square miles in St. Louis, and that it had only 100,000 fewer people. The report recommended an increase in the number of police officers to 1500, and made numerous other suggestions as to things which the department might do, some of which would require additional funds. Mr. Hardy testified that the commission considered the shortage of police officers and the prospect of a further reduction "frightening".

The Hardy report also discussed Kansas City General Hospital, which is supported by the city and provides most of the hospital and out-patient care for underprivileged people of the city. The 1968–1969 budget provided approximately $1,000,000 less for the hospital than did the budget for 1967–1968. The hospital had announced that this reduction in funds would necessitate curtailing the number of beds it could staff by approximately 30 per cent. This did not occur during the months of May and June, 1968, because the city made supplemental appropriations out of its Contingency Fund for those two months so as to permit the same level of operation. Subsequently, the curtailment occurred and there was testimony as to persons being sent from the emergency room to other hospitals on account of lack

of beds. The Hardy report discussed the need for the city to finance the hospital and to provide these needed services.

The Hardy report recommended numerous other things, including "beefing up" the Human Relations Department, providing vest pocket parks, mobile swimming pools, community centers, and recreational facilities in parts of the city, and providing a city trash pickup service.

Without unduly lengthening this opinion by extended discussion of these various items, it is sufficient to say that there was testimony as to the need for these other expenditures in order to care for pressing needs and to avoid a repetition of the April events. Witnesses, including the Mayor, City Manager, Chief of Police, numerous Councilmen, and department heads, testified that the tensions which caused the riots had continued, that an emergency existed and that there was an immediate need to fund these programs to preserve the peace, health and safety of the community. One Councilman testified that if the city had not provided the funds for the Model Cities Program, Human Relations Department work and the Human Resources Corporation, "the city would have been in danger again."

The evidence disclosed that by September 9, 1968, the city's Contingency Fund, which was $465,000 on May 1, 1968, had been reduced by necessary expenditures (such as the $200,000 for overtime to the Police Department and $192,000 to General Hospital to cover its cost of maintaining its level of operations for May and June, 1968) to the sum of $22,052. The city had no other funds from which it could appropriate to meet the requests and needs of the police and other departments to which reference has previously been made herein.

Like most cities, Kansas City had had financial headaches for several years. The demands on it for services exceeded the funds with which to supply them. In 1963 the city had obtained legislation from the Missouri General Assembly which authorized the city, on vote of the people, to impose an earnings tax of ½ of 1 per cent. This tax became effective on January 1, 1964. In addition, the city passed an ordinance imposing a 6 per cent tax on gross receipts of various utilities. These taxes alleviated the situation for a time, but by 1967 the city again needed additional funds and sought authority from the General Assembly to vote on an increase in the earnings tax to 1 per cent. The Governor included such legislation in his call for two special sessions of the General Assembly, but the enabling legislation was not enacted.

On April 11, 1968, while the riot actually was in progress, an ordinance was introduced in the City Council which sought to provide for the increased earnings tax of 1 per cent by amending the city's charter. The city's theory was that enabling legislation by the State would be unnecessary if this were done. Passage of this ordinance was expedited and it was adopted on April 19, 1968. The ordinance called for a charter amendment election to be held on June 25. However, a suit to enjoin the city from holding the election was brought and a permanent injunction was issued by the Circuit Court on May 17, 1968. That case was appealed to this court which, on July 19, affirmed the judgment of the trial court, holding that the city, under the factual situation as it existed, could not increase its earnings tax by amendment of its charter without further legislation by the General Assembly. Grant v. Kansas City, Mo., 431 S.W.2d 89.

The evidence disclosed that the Mayor and most or all of the members of the City Council felt that the earnings tax was a more equitable tax than a utilities tax, and they wanted to provide additional needed funds by means of an earnings tax if at all possible. Consequently, as long as there was any hope of obtaining the funds by means of an increase in the earn-

ings tax, the Council was unwilling to increase the utilities tax. The first ordinance introduced to provide an additional 4 per cent utilities tax was defeated by the Council on June 28, 1968. However, after the decision of the Supreme Court, apparently ending all hope of increasing the earnings tax without enabling legislation, new ordinances increasing the utilities tax were introduced in the Council on August 16, 1968, and adopted on August 30 by a vote of seven to six. Although these ordinances contained recitals of an emergency in the title and preamble of the ordinances, they were not adopted as emergency measures because the required favorable vote of nine Councilmen was not obtained. Some members of the Council voted against the measures because they felt that exemptions granted to large users were too great or they objected to the fact that no exemption was granted to ease the burden of low income families.

After passage of the ordinances on August 30, the Council continued to discuss the question, and on Friday, September 6, 1968, instructed the Legal Department to redraft the ordinances to meet the objections which had been raised. The meeting was adjourned until Monday, September 9, at which time new ordinances granting exemptions on the first $2.00 of each utility bill and decreasing the exemptions granted to large users were introduced and adopted on a vote of ten to three. These ordinances were adopted as emergency ordinances and the ordinances which had been adopted August 30, 1968, were repealed.

The title of each of the September 9, 1968, utility ordinances recited that it was an emergency measure, and each ordinance contained the following preamble:

"WHEREAS, to provide an adequate program of necessary and essential services, the General Fund of the City of Kansas City, requires minimum resources of $49,700,000 for the fiscal year 1968–1969, and

"WHEREAS, the estimated resources of the General Fund of the City of Kansas City during the 1968–1969 fiscal year will provide the City with $46,762,-000, and

"WHEREAS, in order to provide an adequate program of necessary and essential services, the General Fund of Kansas City, Missouri, will need an additional minimum requirement in resources of $2,938,000 for the 1968–1969 fiscal year, and

"WHEREAS, the Council has explored and considered all possible lawful means of obtaining the additional revenue necessary to provide an adequate program of necessary and essential services required for the preservation of the public peace, health, safety and welfare of the community for the fiscal year 1968–1969, and

"WHEREAS, the City has requested at the 1967 General Session of the State Legislature and the 1968 Special Sessions of the State Legislature, legislation in the nature of favorable taxing powers and financial assistance in the maintenance of the City hospitals, police and fire departments, but the Legislature has failed to act thereon, and

"WHEREAS, the additional revenues provided for herein, will provide the City with meaningful assistance in providing these adequate, essential and necessary services to the community so as to safeguard the public peace, health, safety and welfare of the community during the fiscal year 1968–1969, and

"WHEREAS, the employment of additional police officers is immediately necessary; the restoration of curtailed health services at the City hospitals and the restoration of other curtailed health, safety and welfare services is urgently needed, requiring additional funds for their operation, and the Council finds said additional funds are necessary for the immediate preservation of the public

peace, safety, health and welfare in Kansas City, and, therefore, this ordinance is declared to be an emergency measure, * * *."

In addition, each ordinance contained the following section in the body of the ordinance:

"Section C. This ordinance is recognized to be for the immediate preservation of the public peace, property, health and safety within the city, and therefore is hereby declared to be an emergency measure within the provisions of Section 15, Article II of the Charter of Kansas City, and shall take effect immediately upon passage."

█ The above recitals set out facts as a basis for the legislative decision and declaration that the ordinances were emergency measures. The issue then becomes one of whether that decision was justified and whether an emergency did exist. This court has held repeatedly that the courts will review and determine this question. Cases so holding include State ex rel. Asotsky et al. v. Regan, 317 Mo. 1216, 298 S.W. 747, 55 A.L.R. 773; State ex inf. Taylor, Atty. Gen., ex rel. Kansas City v. North Kansas City, 360 Mo. 374, 228 S.W.2d 762; Inter-City Fire Protection District of Jackson County v. Gambrell, 360 Mo. 924, 231 S.W.2d 193; State ex rel. City of Charleston v. Holman, Mo., 355 S.W.2d 946; Board of Regents for Northeast Missouri State Teachers College v. Palmer, 356 Mo. 946, 204 S.W.2d 291. The most recent declaration on the subject by this court was in Padberg v. Roos, Mo., 404 S.W.2d 161, 170:

"Missouri is in accord with the prevalent view that a legislative declaration stating an act to be an emergency measure is entitled to great weight, 'but is not conclusive, because the courts possess the final authority to determine whether an emergency in fact exists.' 16 Am.Jur.2d, Constitutional Law, § 171, p. 390. See also 37 Am.Jur., Municipal Corporations, § 152,

p. 765; Annotations: Emergency Clause in Ordinance, 35 A.L.R.2d 586, 55 A.L.R. 779. Such right is not conferred specifically in any constitutional provision but is an inherent judicial function applicable alike to enactments of the state legislature and of municipal bodies."

The trial court in this case held that an emergency did not exist. Relying on Hatfield v. Meers, Mo.App., 402 S.W.2d 35, the trial court stated: "To be an 'emergency' there must be an *unforeseen combination of circumstances* which call for immediate action. The word signifies some *sudden or unexpected necessity* requiring immediate, or, at least quick action."

The trial court's findings then went on to state as follows: "On September 9, 1969, (sic) did there exist in Kansas City an 'unforeseen combination of circumstances' or 'some sudden or unexpected necessity' in connection with the City's need for funds? This Court does not so find."

In so concluding, the court further said:

"This Court therefore finds from the evidence in this case that the social unrest and racial tensions, the high crime rate, and the need for additional funds for the City's Police, Park, Health and other Departments had existed in varying degrees in Kansas City for several years before the enactment of subject utility ordinances."

The test for determining the existence of an emergency, as expressed in Hatfield and repeated in the trial court's findings and judgment, involves foreseeability of the conditions or circumstances which require quick or immediate action. The only case cited in Hatfield is Mallon v. Board of Water Commissioners, 144 Mo.App. 104, 128 S.W. 764, but that case holds (128 S.W. l. c. 765) that the "word signifies some sudden *or* unexpected necessity * * *." (Emphasis supplied.) It will be observed that Mallon apparently recognizes that

the necessity could be sudden without being unexpected.

In any event, there can be little doubt in our view that Kansas City had a crisis on its hands when the rioting occurred in April, 1968. The fact that such occurrences might possibly have been forecast on the basis of pre-existing racial conditions and the need for additional police services, parks, health services and other activities or facilities did not lessen the gravity of the situation which confronted the city beginning on April 9, 1968. That crisis was an emergency for the city which involved the need for immediate action to preserve the public peace, safety, health and welfare. Many witnesses testified that the tension and conditions which produced the rioting continued up to the time of the Council meeting on September 9. The Hardy report indicated its continuance.

■ Certainly, there can be and are emergencies which are unforeseen, but it does not follow that a crisis or emergency may exist only if it is unforeseen. For example, it is foreseeable that cities located on our great rivers are subject to high water and flood damage under certain circumstances. When there is heavy snowfall during the winter, it clearly is foreseeable that if there is a rapid thaw during a warm spring, there will be flooding. Likewise, it is foreseeable that in a year such as 1969 in which there is heavy rainfall, there will be high water and resulting crises. The fact that the flooding in these instances could have been foreseen does not prevent the existence of an emergency when the flooding occurs.

■ The test of whether an emergency exists which justifies enactment of emergency legislation is not one of foreseeability. The circumstance that events asserted to create an emergency were unforeseen may be additional evidence that an emergency exists, but absence of foreseeability is not a *sine qua non*. Rather, the test is whether the factual situation is such that there is actually a crisis or emergency which requires immediate or quick legislative action for the preservation of the public peace, property, health, safety or morals.

■ Relators advanced two additional propositions on the question of whether an emergency existed. In the first place, they mentioned that four utility tax ordinances were adopted on August 30, 1968, as normal revenue measures. They imply that this shows that no emergency existed on August 30. This does not follow. The record discloses that actually the preamble of those ordinances recited facts to show an emergency, but they were not adopted as emergency ordinances simply because there were not sufficient votes for that purpose. Several Councilmen objected to the exemptions provided therein and would not vote for the measures for that reason. When new measures were drafted providing exemptions with which they were satisfied, the August 30th ordinances were repealed and new emergency ordinances were then adopted on September 9. The evidence indicates that the emergency situation also existed on August 30 and previously.

■ The other proposition advanced by relators is that these cannot be considered emergency measures because no city department was shown to have been out of money on September 9. That is not determinative. Only one-third of the fiscal year had elapsed. The departments had not spent their entire year's appropriation during that four-month period. They were, however, confronted with the situation in which they could not provide the things which were deemed necessary in order to alleviate the situation. In addition, the Police Department was faced with the necessity of eliminating its Police Academy and making a substantial cut in uniformed policemen for the remainder of the year due to the fact that it had spent funds up to that time at a rate not justified by its appropriation for the year but deemed nec-

essary following the riots to prevent other trouble.

We conclude, on the record before us, that the City Council had ample justification for its determination that an emergency did exist which justified passage of the four utility tax ordinances as emergency measures, and we so hold.

The judgment of the Circuit Court is reversed and the peremptory writ of mandamus is quashed.

All concur.