Michael ATCHISON, William Wardlaw, et al., Appellants,

v.

The DISTRICT OF COLUMBIA, Marion S. Barry, et al., Appellees.

Nos. 90–1001, 90–1004.

District of Columbia Court of Appeals.

Argued Nov. 1, 1990.
Decided Jan. 9, 1991.

Lois G. Williams, with whom John W. Nields, Jr., and Stephen W. Brice, Washington, D.C., were on the brief, for appellants.

Lutz Alexander Prager, Asst. Deputy Corp. Counsel, with whom Herbert O. Reid, Sr., Corp. Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellees.

Before NEWMAN, FERREN, and FARRELL, Associate Judges.

FARRELL, Associate Judge:

These appeals stem from two consolidated actions for declaratory judgment seeking to invalidate emergency legislation enacted by the Council of the District of Columbia in June 1990. That legislation amended previous laws adopted partly by initiative which granted rights to shelter and housing assistance to homeless individuals and families in the District of Columbia. The Superior Court held the emergency act to be a valid exercise of the Council's legislative powers and denied the motions. In this court, appellants argue first that the Council lacks any power to repeal or substantially amend laws enacted by the electorate through the initiative process,

and second, assuming such power, that the Council abused its authority by passing emergency legislation in the absence of any actual emergency. We affirm the decision of the trial court.

## I.

In 1984, the voters of the District of Columbia adopted an initiative which became the District of Columbia Right to Overnight Shelter Act of 1984 (Overnight Shelter Act), D.C.Law 5–146, D.C.Code §§ 3–601 to –607 (1988), granting to all persons in the District of Columbia "the right to adequate overnight shelter." D.C. Code § 3–601. In 1987, the Council of the District of Columbia, responding to similar concerns, enacted D.C.Law 7–86, the Emergency Shelter Services for Families Reform Amendment Act of 1987 (the Family Shelter Act), which established a homeless shelter program for eligible homeless families. *See* D.C.Code § 3–206.3. In 1988, a group of individuals known here as the *Atchison* plaintiffs brought suit in Superior Court on behalf of single homeless adults challenging the District's failure to comply with D.C.Law 5–146. Following entry of a preliminary injunction against the District, the parties arrived at a consent decree which the court approved in June 1989. In October and December 1989, and in July 1990, the trial court found the District in contempt of the consent decree and imposed daily fines of up to $5,000 for each of multiple types of violations, totalling up to $30,000 per day. As of June 1990, the District had paid nearly $2 million in fines.

In February 1989, members of the Council introduced permanent legislation, Bill 8–156, to make major changes in both the Overnight Shelter Act and the Family Shelter Act. A public hearing was held in April 1989, but the bill did not emerge from committee until May 1990. The committee report cited an "explosion" in costs incurred by the District for homeless shelter programs, partly as a result of court decisions, at the same time that federal support for low- and moderate-income housing had declined. The intent of the bill, therefore, was

> to limit specifically and to define clearly the "obligation" of the District of Columbia.... [S]ince enactment of this law [the Overnight Shelter Act], the District government has had to spend excessive amounts of appropriated funds for this program because the "Shelter Act" as approved contained no spending constraints in it, and the District has expended millions of dollars on this one program.

Council of the District of Columbia, Committee Report on Bill 8–156, at 14 (May 10, 1990) (Committee Report). Restrictions called for by the bill would prevent judicial "embellish[ments]" and enlargements of existing homeless shelter rights. *Id.* at 5.[1]

During the initial reading of Bill 8–156 on June 12, 1990, members of the Council repeatedly expressed concern about the uncontained demands the homeless shelter programs were placing on District funds. Councilmember Crawford, chairman of the committee responsible for the legislation, informed his colleagues that, since 1985, expenditures for homeless shelters had

1. The need to curb escalating costs, the committee wrote, was especially important at a time of acute fiscal difficulty:

> The Council [is] ... the government entity empowered by the Home Rule Charter to consider and decide matters related to the authorization of funding levels for District expenditures....
>
> Moreover, the Committee believes that as the District currently is faced with severe budget constraints brought on by less than anticipated revenues and the desire of taxpayers,

who are already among the most taxed per capita in the United States, to avoid increases in real property or income taxes, and a shrinking ability to impose additional sales or use taxes, it has a compelling interest in having the ability to define appropriately its spending practices. The Committee believes that the Council has a duty to all of the citizens of the District to be able to decide authorization for all District appropriated expenditures in the normal annual budget process.

Committee Report, at 23.

vastly exceeded appropriations.[2] He termed the spending "exorbitant" and offered the following explanation for it:

> Over the past 3 years the District's emergency shelter program, as a result of Initiative 17 as approved, has been essentially operated by the courts which embellished the law requiring the District to provide certain services and to accomplish certain actions not contemplated by the law because no legislative history was available, forcing the District into unrestrained spending and the payment of over $1.9 million in fines to date.

Other members of the Council expressed similar views.

At its June 26, 1990 session, following second reading of the permanent legislation amending D.C.Laws 5–146 and 7–86, the Council adopted a resolution declaring an emergency[3] and enacted D.C.Act 8–226, 37 D.C.Reg. 4674–4675 (1990), the Emergency Act which is the subject of this appeal. The resolution began by noting that the Overnight Shelter Act required the District government "to provide overnight shelter to any homeless person who requests shelter without regard to budgetary limitations of the District government." It explained that the Act had been "interpreted by the courts as an entitlement to shelter that includes other requirements that have resulted in the inability of the District to be flexible in the operation of the emergency shelter program"; that the District was currently liable for civil contempt fines amounting to $5,000 per day in the *Atchison* litigation involving the Overnight Shelter Act; and that litigation enforcing the Family Shelter Act was pending, which required "clarification of the intent of Coun-

cil" to guide the "imminent" decision in that enforcement proceeding. After pointing out that the Council was expected to pass permanent legislation amending the Overnight Shelter Act but which would not be effective until October 1990, the resolution summarized the present cost of emergency shelter and support services:

> It is anticipated that the District will spend $40 million to provide emergency shelter and support services to homeless persons and families in Fiscal Year 1990, including in excess of $2 million in court fines. To date, amounts spent to provide emergency shelter and pay court fines have already exceeded the budget of $23 million that was originally approved by the Council and the Congress.

The resolution further explained that "[t]he District government is experiencing a serious budget crisis brought on by declining revenues and increases in uncontrollable spending." It concluded that unless immediate legislative action were taken to amend the entitlement provision of the Overnight Shelter Act and clarify the Council's intent in the Family Shelter Act, the District would continue to incur fines of more than $5,000 per day in the consent decree case and be subject to additional fines in the pending suit under the latter statute.

The Emergency Act, subsequently signed by the Mayor, provides that henceforth the homeless shelter program is subject to the availability of "funds appropriated for [that] specific purpose." Sec. 2(a). The Act repeals § 7 of the Overnight Shelter Act, D.C.Code § 3–606, which had authorized judicial enforcement of the right to overnight shelter. Sec. 2(b). The Act

---

**2.** Councilmember Crawford cited the following costs:

| Year | Appropriations | Actual Costs, Local | Total Costs (including federal funds) |
|---|---|---|---|
| 1985 | $ 5.9 million | $ 9.2 million | $10.3 million |
| 1986 | 10.6 | 15.2 | 17.9 |
| 1987 | 12.1 | 17.9 | 26.2 |
| 1988 | 21.5 | 26.4 | 32.0 |
| 1989 | 27.2 | 33.6 | 40.9 |
| 1990 | 26.0 | 32.6 (projected) | 40 + (projected) |

**3.** Res. 8–234, 37 D.C.Reg. 4431–4432 (1990).

also declares that no "entitlement" to overnight shelter or transportation exists under either of the previous laws. Secs. 2(c), 3. The permanent legislation, D.C.Act 8–228, 37 D.C.Reg. 4815–4823 (1990), was signed by the Mayor on July 12, 1990, and transmitted to Congress for review.[4]

After enactment of the emergency legislation, suit was filed in Superior Court by individuals and a committee known here together as the *Wardlaw* plaintiffs claiming that there had been no genuine emergency justifying the legislation, and that in any event the Council lacks power to reject or amend laws enacted by initiative. Upon consolidated motions for declaratory judgment filed by the *Atchison* and *Wardlaw* plaintiffs, the trial court rejected both contentions and upheld the emergency legislation. The court also suspended new obligations of the District under the consent decree while the emergency legislation was in effect.

## II.

The first issue we must decide is whether these appeals are moot because the emergency legislation has expired. *See* D.C.Code § 1–229(a) (emergency legislation effective for period not to exceed 90 days). We begin by recognizing that "the decisions of the Supreme Court on the issue of mootness," which arise in the context of the case or controversy requirement of Article III of the Constitution, "are not binding on this court." *Lynch v. United States*, 557 A.2d 580, 582 (D.C.1989) (en banc). *See also District of Columbia v. Walters*, 319 A.2d 332, 338 n. 13 (D.C.), *appeal dismissed and cert. denied*, 419 U.S. 1065, 95 S.Ct. 650, 42 L.Ed.2d 661 (1974). Nevertheless, although this court thus enjoys flexibility in regard to mootness not possessed by the federal courts,[5] "this court has followed the principles of standing, justiciability and mootness to promote sound judicial economy and has recognized that an adversary system can best adjudicate real, not abstract, conflicts." *Id. See Basiliko v. District of Columbia*, 283 A.2d 816, 818 (D.C.1971); *Banks v. Ferrell*, 411 A.2d 54, 56 n. 7 (D.C.1979).[6] Our decisions thus require the exercise of careful discretion in deciding whether to reach the merits of a seemingly moot controversy.

As pointed out above, appellants make two contentions on appeal, the first of which we conclude would plainly be insufficient itself to warrant our attention in view of the expiration of the Emergency Act. Appellants maintain that no genuine emergency existed and that the emergency legislation in effect was a dodge to avoid the more onerous procedural requirements for enacting permanent legislation. The question whether the emergency in question was genuine cannot reasonably be said to be one capable of recurring (yet evading review), and hence calling for resolution despite the lapse of the emergency legislation. *Cf. District of Columbia v. Washington Home Ownership Council, Inc.*, 415 A.2d 1349, 1350 n. 3 (D.C.1980) (en banc) (question whether Council of the District of Columbia had power to enact substantially identical successive emergency acts held "capable of repetition, yet evading review" and hence ripe for decision). Almost by definition, the question whether an emergency existed within the meaning of the Council's authority to pass such legislation depends on the facts before the Council at the time; any future such (strictly hypothetical) finding of emergency of a similar kind will likewise be rooted in its own individual circumstances.

---

4. During the required 30–day congressional review period, a valid petition was filed with the District of Columbia Board of Elections and Ethics to refer the permanent legislation to the voters for a referendum. This had the effect of suspending the legislation until the referendum was conducted. D.C.Code § 1–281(b) (1987). We take judicial notice of the fact that the referendum proposing rejection of the permanent legislation was defeated at the general election on November 6, 1990.

5. *See Murphy v. Hunt*, 455 U.S. 478, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982); *Weinstein v. Bradford*, 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975).

6. *See also Kopff v. District of Columbia Alcoholic Beverage Control Bd.*, 381 A.2d 1372, 1378 (D.C.1977) ("our jurisdiction is limited by the same 'case or controversy' requirement, *see* D.C. Code 1973, § 11–705(b), as that imposed on the Article III courts").

The second ground of these appeals, however, presents the much broader legal challenge to the power of the Council ever to repeal or substantially amend laws enacted by the initiative process. The scope of this question—in the words of a previous decision of ours declining to dismiss for mootness—"extends well beyond the rights of the specific parties." *Pendleton v. District of Columbia Bd. of Elections & Ethics*, 449 A.2d 301, 303 n. 1 (D.C.1982). Still, there is a serious question whether we should decide the issue at the present time. Unlike appellants' challenge to the actual existence of an emergency, their *per se* challenge to the Council's authority to repeal initiative-generated legislation can be raised at a future time and in the context of *permanent* legislation, thus eliminating the concern that the issue will evade review. That challenge does not depend on the facts of this case (save to the limited extent appellants argue that emergency rather than permanent legislation highlights the asserted evil in allowing Council amendment of initiative-engendered legislation).

Nevertheless, while heedful of our limitations in this area, we conclude that the latter issue raised by appellants warrants proceeding with this appeal. First, although of secondary importance, both issues presented were not moot at the time the trial court considered them, and the parties and the court invested considerable effort in their resolution. *Cf. Murphy v. Hunt, supra* note 5, 455 U.S. at 484, 102 S.Ct. at 1184 (issue moot at time both court of appeals and district court decided it); *District of Columbia v. Walters*, 319 A.2d at 338 & n. 13 (*trial court* abused its discretion in ruling on merits of issue where no person was before court with standing to raise it). Second, as pointed out above, the issue of the Council's power to amend legislation passed by initiative is of broad importance, not the least to the Council itself, a coordinate branch of government; in light of the vigorous challenge appellants have mounted, it seems ill-advised to us to leave that body with the least uncertainty as to the scope of its authority on this subject. Finally, since mootness seeks ultimately "to promote

sound judicial economy," *Basiliko, supra,* we think it appropriate to decide these appeals on the merits rather than await another and—in view of appellants' determination shown so far—predictable round of trial litigation in respect to the permanent homeless legislation raising the issue of the Council's power.

### III.

The Emergency Act repealed or amended provisions of law adopted both by initiative (the Overnight Shelter Act) and by Council action (the Family Shelter Act). Conceding that the Council has the authority to repeal laws enacted through its legislative power, appellants contest only the power of the Council to repeal—or amend in more than technical fashion—laws adopted through the initiative process. They maintain that the District Charter does not expressly authorize such repeals, that the legislative history reveals an intent to deny the Council this power, and that to imply such a power would both disturb the "legislative supremacy" (with a narrow exception not here relevant) given the voters when they act by initiative and beget a system of "legislative ping-pong" whereby each "legislature [the Council and the voters] passes legislation only to be amended or repealed by the other legislature, leading to reenactment" and so forth. We are not persuaded by any of these arguments.

The District of Columbia Self–Government and Governmental Reorganization Act, Pub.L. No. 93–198, 87 Stat. 774 (1973) (the Home Rule Act), granted the District of Columbia partial home rule and "delegate[d] certain legislative powers" to the newly-established local government. D.C. Code § 1–201(a) (1987). The self-governing aspects of the Home Rule Act are contained in Titles III and IV, known as the District Charter. Section 302, D.C.Code § 1–204, declares that, "Except as provided in [certain sections of the Home Rule Act not here relevant], the legislative power of the District shall extend to all rightful subjects of legislation within the District" consistent with the Constitution and the Home

Rule Act. Section 404(a), D.C.Code § 1–227(a), in turn provides that, except for the same limitations not relevant here, "the legislative power granted to the District by this Act is vested in and shall be exercised by the Council in accordance with this Act."

Originally, the Home Rule Act did not confer the rights of initiative or referendum upon the voters. These rights were granted in 1978 by the Initiative, Referendum, and Recall Charter Amendments Act of 1977 (Charter Amendments Act), D.C.Law 2–46, D.C.Code §§ 1–281 *et seq.*, which gave the electorate the power to adopt initiatives in a manner "coextensive with the power of the legislature to adopt legislative measures." *Convention Center Referendum Comm. v. District of Columbia Bd. of Elections & Ethics*, 441 A.2d 889, 897 (D.C.1981) (en banc) (plurality opinion). The Charter Amendments Act, however, imposed only a single express limitation on the Council's legislative powers, by providing that if the voters at a referendum reject permanent legislation passed by the Council, "no action may be taken by the Council of the District of Columbia with regard to the matter presented at referendum for the 365 days following the date of the District of Columbia Board of Elections and Ethics' certification of the vote." D.C.Code § 1–284; *see* § 1–281(b). In addition, § 1–285 provides that either an adopted initiative or an act approved by referendum "shall be an act of the Council" upon certification of the vote, "and such act shall become law subject to the provisions" of § 1–233(c) governing congressional review.

From this statutory scheme the District argues, we think persuasively, that the plenary legislative power given the Council includes the authority to repeal existing legislation, whether or not derived from an initiative. Certainly nothing on the face of either the Home Rule Act or the Charter Amendments Act purports to deny the Council that authority. Indeed, when the Charter Amendments Act intended to shield citizen legislative action from Council reconsideration, it knew expressly how to do so—as by barring Council action for one year with regard to matters that had been the subject of enactments rejected by referendum. Moreover, as noted, adopted initiatives become "act[s] of the Council" like any others, without any indication in the Charter that the Council may not reconsider their wisdom and amend them like any other legislation. Appellants point to legislative history suggesting that this provision (§ 1–285) was meant to insure only that initiative enactments, like all other permanent legislation, would undergo congressional review. But the plain effect of the language is to equate acts approved by referendum or adopted by initiative with any other "act of the Council." Appellants' argument, by contrast, would elevate initiatives, insofar as amendment is concerned, to the plane of the Charter itself by requiring approval of the electorate before either can be amended. We find nothing in the statute which reflects an intent to endow the former with this unique importance.

In support of their argument, appellants cite the fact that the original bill underlying the Charter Amendments Act would have granted the Council the express power to "amend or repeal an initiative act," but that the provision was deleted from the bill as passed and approved by the voters and Congress. We agree with the government, however, that no significance can be attached to this omission in view of the plenary authority already possessed by the Council under § 404(a) of the Charter, D.C. Code § 1–227(a). Appellants point to citizen comments at the public hearing on the original bill critical of the proposed power of the Council to repeal voter approved or initiated legislation. It is a considerable leap from this, however, to infer—without any supporting statutory language—that the Council reacted by banning Council amendment of initiated laws. Indeed, the legislative materials suggest with equal plausibility that the Council responded to this criticism by adopting the one-year moratorium on Council legislation similar in subject matter to acts rejected by refer-

endum.[7] *Cf. United States v. Wells Fargo Bank,* 485 U.S. 351, 358, 108 S.Ct. 1179, 1183, 99 L.Ed.2d 368 (1988) (failure to include administration-sponsored provision in tax bill does not lead to conclusion it was rejected; equally plausible on record is likelihood provision was omitted because unnecessary).

Finally, in view of our discussion so far, it is apparent that we cannot accept appellants' argument that to allow Council repeal of initiatives would upset the "legislative supremacy" accorded the voters when they act by initiative. On the whole, the electorate's power to adopt initiatives is "coextensive with the power of the legislature to adopt legislative measures," *Convention Center, supra,* but it is not more than that. Nor does the specter of legislative "ping-pong" that appellants raise justify ignoring the grant of plenary authority to the Council in § 404 of the Home Rule Act. As the trial court recognized, the referendum power provides a check on the Council's ability to countermand citizen initiatives by permanent legislation, and ultimately the electoral process can be relied on to curb the defiance of the popular will that appellants hypothesize.

## IV.

■ Appellants further contend that the Emergency Act "unlawfully avoids Congressional review by declaring as an 'emergency' circumstances which, on their face, cannot be regarded as an emergency under the Home Rule Act." They point out that permanent legislation to repeal the Overnight Shelter Act was introduced 16 months before the declaration of an emergency, and that the sponsors announced their intention to pass it as an "emergency" act a full 100 days before the Council

fully did so. We conclude, under the applicable standard of review, that these facts are insufficient to invalidate the Council's judgment that immediate action was necessary to stem the expenditure of funds in excess of appropriations caused by the shelter legislation.

The Home Rule Act does not define an "emergency" but provides that, to pass emergency legislation, the Council must determine "by a vote of two-thirds of the members, that emergency circumstances make it necessary that an act be passed after a single reading, or that it take effect immediately upon enactment." D.C.Code § 1-229(a). This court will review emergency legislation to insure that it complies with the Home Rule Act. *United States v. Alston,* 580 A.2d 587, 596–97 (D.C.1990); *AFGE v. Barry,* 459 A.2d 1045, 1050–51 (D.C.1983). Our cases have reviewed the validity of emergency acts in two situations—when the legislation is claimed to be the functional equivalent of (and hence to circumvent the requirements for) permanent legislation, and when the authenticity of the emergency declaration is questioned. These appeals present only the latter claim.[8] In *AFGE, supra,* we discussed the considerations affecting our choice of standard of review of a declaration of emergency, in particular the need to "balance deference to the legislative authority of the Council, with our own duty to oversee Council action which might exceed congressionally delegated authority." 459 A.2d at 1050. We concluded that Congress' delegation to the Council of the required determination

> calls for substantial deference to the Council's definition and determination of "emergency circumstances," a deference that is not likely to erode congressional

---

7. *See, e.g.,* Council of the District of Columbia, Committee Report No. 1: Bill No. 2-2 and Bill No. 2-94, at 5, 17 (Mar. 16, 1977).

8. Legislation that is deemed "emergency legislation" by the Council but nonetheless functions as permanent legislation is invalid because it circumvents the review process mandated by the Home Rule Act, particularly the Congressional layover period. *See Washington Home Ownership Council, Inc., supra* (passage of series

of emergency acts in lieu of permanent legislation in response to ongoing emergency improper); *Maryland v. Barry,* 604 F.Supp. 495, 500–01 (D.D.C.1985) (passage of annual emergency acts in response to repetitive seasonal emergencies in lieu of permanent legislation improper). *But see Alston, supra* (passage of successive emergency acts to maintain legislative status quo while identical laws are subject to Congressional review proper).

prerogatives because, very simply, emergency circumstances by definition cannot last very long. Therefore, in looking at a legislatively declared emergency, we seek only to assure ourselves that the act is *facially valid, i.e.,* consistent with Council legislative authority in partnership with Congress. *See State ex rel. Hoppe v. Meyers,* 58 Wash.2d 320, 363 P.2d 121 (1961) (en banc) (legislative determination of emergency is conclusive unless facially false).

*Id.* at 1051 (emphasis added; other citation omitted). In *Alston, supra,* we formulated the question—perhaps somewhat more probingly—as whether any basis existed "on which to hold that the Council abused its authority in determining that an emergency existed necessitating emergency legislative action." 580 A.2d at 597.

Whatever further definition may be given the "substantial deference" we owe the Council's determination that an emergency exists, we conclude that the Council's finding in this case must be sustained. Appellants contend there was no showing "that the Council was acting in response to a sudden, unforeseeable, unforeseen crisis," but in *AFGE* we implicitly rejected a similar claim "that only 'unforeseen circumstances' may be the basis for emergency legislation," 459 A.2d at 1050 n. 9. We agree with the court in *State ex rel. Tyler v. Davis,* 443 S.W.2d 625, 631 (Mo.1969), that

[c]ertainly, there can be and are emergencies which are unforeseen, but it does not follow that a crisis or emergency may exist only if it is unforeseen ....

... The circumstance that events asserted to create an emergency were unforeseen may be additional evidence that an emergency exists, but absence of foreseeability is not a *sine qua non.* Rather, the test is whether the factual situation is such that there is actually a crisis or emergency which requires immediate or quick legislative action for the preservation of the public peace, property, health, safety or morals.

*See AFGE,* 459 A.2d at 1050 n. 9 (quoting trial court's finding to like effect).

Although it no doubt was foreseeable well before June 1990 that the District government would continue to expend funds and be subject to fines under the shelter legislation and the consent decree, none of this casts doubt on the authenticity of the Council's determination in May and June that an emergency existed because the shelter program was costing far in excess of appropriations at a time of fiscal crisis. Findings 7 and 8 of the emergency resolution bear repeating:

(7) It is anticipated that the District will spend $40 million to provide emergency shelter and support services to homeless persons and families in Fiscal Year 1990, including in excess of $2 million in court fines. To date, amounts spent to provide emergency shelter and pay court fines have already exceeded the budget of $23 million that was originally approved by the Council and the Congress.

(8) The District government is experiencing a serious budget crisis brought on by declining revenues and increases in uncontrollable spending.

Whether or not this crisis could have been foreseen, and however traceable it may be—as appellants assert—to a lack of political will to act earlier by passing permanent legislation, the Council's inaction cannot nullify a need which it perceived to be acute in view of the magnitude by which expenditures were outstripping appropriations. *See* D.C.Code § 47–313(e). (1990) (federal Anti–Deficiency Act applies to the District of Columbia).

It is significant, moreover, that the emergency legislation was adopted solely to cover the time period during which permanent legislation was undergoing congressional review. As our decision in *AFGE* made plain, court review of emergency legislation is necessary only—but importantly—to safeguard Congress' reservation to itself "of a substantial role in the legislative process through the 'layover' provision permitting congressional [disapproval] or amendment of Council legislation." 459 A.2d at 1050. When, as in this case, the Council

"has acted to address concerns about public safety [or welfare] by enacting legislation which Congress has had the opportunity to review," *Alston*, 580 A.2d at 598–99, the risk of an "ero[sion of] congressional prerogatives," *AFGE*, by the interim enactment of emergency legislation is greatly reduced.

For the foregoing reasons, the order of the Superior Court denying the motions for declaratory judgment is

*Affirmed.*