**PARENTS UNITED FOR THE DISTRICT OF COLUMBIA PUBLIC SCHOOLS, et al., Plaintiffs–Appellants,**

v.

**DISTRICT OF COLUMBIA, et al., Defendants–Appellants.**

Nos. 97–CV–1294 to 97–CV–1296.

District of Columbia Court of Appeals.

Argued Aug. 22, 1997.
Decided Aug. 22, 1997.

---

Alfred M. Mamlet, with whom Barbara K. Kagan and Andrea C. Evans, Washington, DC, were on the Joint Motion, for plaintiffs-appellants Parents United for the District of Columbia Public Schools, et al.

Donna M. Murasky, Assistant Corporation Counsel, with whom Jo Anne Robinson, Interim Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, were on the Joint Motion, for defendants-appellants the District of Columbia, et al.

Thomas C. Papson, amicus curiae, Washington, DC, assigned by the court.*

Roderick V.O. Boggs, Washington, DC, Mary Levy, and the Washington Lawyers' Committee for Civil Rights and Urban Affairs also entered an appearance.

Daniel A. Rezneck, General Counsel, District of Columbia Financial Responsibility and Management Assistance Authority, argued and filed a brief *amicus curiae* in behalf of appellants.

Before FARRELL and REID, Associate Judges, and NEWMAN, Senior Judge.

FARRELL, Associate Judge:

■ This court previously heard oral argument on appellants' Joint Emergency Motion for Summary Reversal and, in the Alternative, for a Stay of orders of the trial court (Kaye K. Christian) denying a joint request of the parties to permit certain public schools of the District of Columbia to open on September 2, 1997, even though roof replacement and repair work on those schools would not be finished by that date. At the conclusion of argument, this court denied the joint motion for summary reversal or a stay. We now affirm the orders appealed from *sua sponte*, and state the reasons for our combined disposition.[1]

---

* The court expresses its deep gratitude to Thomas C. Papson, Esquire, and the law firm of McKenna and Cuneo for the assistance they have provided the court in these appeals.

1. For this court's authority to affirm *sua sponte*, see, e.g., *Martin v. United States*, 614 A.2d 51, 53–54 (D.C.1992). We do not consider, as unnecessary to our disposition, the issue debated by the parties and *amicus* at oral argument whether this dispute is mooted by a subsequent decision of the Chief Executive Officer–Superintendent of the District of Columbia Public Schools that the public schools will not open on September 2 in any event. Since mootness does not go to our jurisdiction, *see Atchison v. District of Columbia*, 585 A.2d 150, 153 (D.C.1991), and reasonable arguments have been made to us on both sides of the issue, we choose not to decide it unnecessarily.

## I.

The twin orders in dispute, dated August 13 and 14, 1997, arise against the background of ongoing supervision and enforcement by the trial court of a final injunctive order which it entered in June of 1994. That order, issued after a trial and findings by the court that responsible District of Columbia officials had failed in their statutory duty to address widespread violations of the District of Columbia Fire Prevention Code (Fire Code) and unsafe conditions in the District's public schools, required the Fire Chief to conduct periodic inspections of public school buildings, abate violations of the Fire Code, and order immediate closing of any public school building having life threatening Fire Code violations. Since the 1994 order, the trial court has issued more than fifty remedial orders in response to motions by the plaintiffs, Parents United for the District of Columbia Public Schools, *et al.,* to compel compliance with the original decree and as part of the court's ongoing supervision and enforcement of the injunction. The continuing effect of the 1994 order and the trial court's retention of supervisory authority over school operations to the extent reflected therein are not challenged here.

In the orders presently appealed from, which relate to the opening of certain public schools for the school year 1997–98, the trial court denied a joint request of the parties to permit approximately fifty schools (including high schools, middle schools, and elementary schools) to open on September 2, 1997, even if scheduled roof replacement and repair work on those schools is not completed by that date.[2] The trial court denied the motion on the basis of testimony at previous hearings which convinced it that roof repair and construction work performed while children and staff were in the buildings was "inherently dangerous activity" threatening the safety of inhabitants to a degree that safety measures proposed by the parties could not overcome.[3]

## II.

■ The principal regulatory authority relied on by the trial court was section F–110.1 of the Building Officials and Code Administrators (BOCA) National Fire Prevention Code, substantially incorporated in the District of Columbia Fire Prevention Code Supplement of 1992. Section F–110.1 reads:

> When, in the opinion of the code official, there is actual and potential danger to the occupants of [*sic;* or] those in the proximity of any building, structure or premises because of unsafe structural conditions, or inadequacy of any means of egress, or the presence of explosives, explosive fumes or vapors, or the presence of toxic fumes, gases or materials, the code official shall order the immediate evacuation of said building, structure or premises. All of the occupants so notified shall immediately leave the building, structure or premises and persons shall not enter or reenter until authorized to do so by the code official.

39 D.C.Reg. 8922 (1992).

■ The first argument made by the joint appellants is that, assuming for the moment that the trial court had the authority to supplant the "opinion of the code official [the Fire Chief]" with its own, section F–110.1 permits evacuation and closure of buildings only if "there has been a substantive violation of the Fire Code," as set forth specifically elsewhere in the Code, "that requires enforcement" (Joint Emergency Motion at 15). We reject this argument. The section does not refer to "violations" but rather to "unsafe structural *conditions*" (emphasis added) and similar hazards which pose an "actual and potential danger" to the occupants. The section (part of section F–110.0 entitled "Emergency Measures") authorizes the code official to act before such conditions ripen into actual violations, provided the necessary danger is found.[4] The trial court had before it a record of recent Fire Code violations and unsafe conditions arising from the very construction

---

**2.** All other schools are not affected by the trial court's ruling.

**3.** As no transcripts have been ordered for these appeals, the trial court's findings with respect to safety incidents that have occurred during the

roof work so far must be accepted. *See Cobb v. Standard Drug Co.,* 453 A.2d 110 (D.C.1982).

**4.** Conversely, violations of the Code found to exist might not be enough in themselves to justify emergency intervention under § F–110.1.

work being done on the school roofs. The court noted, for example, the frequency with which contractors had failed to obtain needed permits for use of propane gas in connection with the work. The court also recognized the hazards caused by bringing school children into near proximity with "large quantities of combustible materials and debris, ... [and] such ignition sources as temporary heating devices, cutting and welding torches, open propane fires, hot asphalt and tar kettles, and smoking." Section F–109.0 of the BOCA Code gives the official broad discretion to identify such "unsafe conditions," and section F–110.1, in turn, requires intervention when in the official's opinion closure of the building is necessary to protect the safety of the inhabitants.

▪ The District of Columbia appellants argue further that the trial court has "usurped the authority" of the code official, the Fire Chief, by rejecting his determination that the roof repair work here does not require closure of buildings provided the safety measures jointly proposed to the court by himself and the plaintiffs' fire safety expert, Richard T. Johnson, are put in place.[5] But this decision of the trial court cannot be analyzed in a vacuum. It was made in the exercise of the broad injunctive authority the court has preserved in regard to school openings since 1994 based on findings then that officials, including the Fire Chief, had failed to inspect for and abate code violations and safety hazards in the schools. *Cf. Hutto v. Finney,* 437 U.S. 678, 687 & n. 9, 98 S.Ct. 2565, 2572 & n. 9, 57 L.Ed.2d 522 (1978) (trial court's equitable powers once properly invoked are "broad" both to remedy past wrongs and to stop ongoing violations). Thus, the deference normally owed to the judgment of an administrator charged with interpreting and applying regulations is largely offset here by the continuing supervision, unchallenged, which the trial court has exercised over the Fire Chief's decisionmaking in regard to school openings and closings. Even so, we agree that the trial court could

not *unreasonably* reject expert testimony offered by both sides that the repair and replacement work can go forward safely on inhabited buildings. *Cf. Rock Creek Plaza–Woodner Ltd. Partnership v. District of Columbia,* 466 A.2d 857, 859 (D.C.1983) (citations omitted) ("an expert's testimony may not 'arbitrarily be disregarded, disbelieved or rejected'"). But the court did not do so here.

▪ To begin with, although Mr. Johnson represented that "roofs are lawfully replaced on public buildings, including public school buildings[,] on a daily basis throughout the country while the buildings are inhabited," the trial court set against that assurance the sheer size of the task being carried out in the District where repair and replacement work is being done on as many as fifty schools simultaneously—a project, it concluded, that "clearly stretches the safety capabilities of all concerned." Added to this is the fact testified to by the District's Public School Chief Operating Officer "that in many instances it is not simply a matter of replacing the roof, but there is also the possibility of needed stabilization work." The same official acknowledged in an affidavit supporting the parties' motion to the trial court that, "[i]n all of the current DCPS roof replacements, removal of roofing down to the structural base or substrate is required because of deteriorated insulation and/or insufficient drainage slope."

Further, the parties do not so much question the trial court's finding that roof replacement work carried on around school children is "inherently dangerous"—including (as the court found) "'attractive nuisances' such as propane tanks, ladders, and scaffolding"—as they contend that the dangers can be managed or contained. But the performance of the work done so far gave the trial court strong reason to doubt that assurance. She knew, in particular,

— that unknown to the general project manager for the roof work, a roofing

---

**5.** Those measures consisted of having fire watch personnel on each job site for whom the Fire Department was "able and willing to provide training"; a list of special instructions prepared by the Fire Department for use and handling of propane gas during roof repair; inspections of each roof in question every other day by fire inspectors; and immediate abatement of any violation found during inspections as well as evacuation of schools where such violations had not been abated.

contractor had not obtained the needed Fire Department permits for some eleven propane tanks used in the operation

— that at Tyler Elementary School one fire had broken out and another had been "caused by children from the surrounding neighborhood tampering with unsecured propane tanks"

— and that at another school a "contractor's tools [had fallen] through the roof, followed by the contractor." [6]

Beyond this, the very deficiencies that had given rise to the court's 1994 order, including that "schools were permitted by the Fire Chief to go uninspected for periods well over five years," undermined its confidence that the Fire Department (currently numbering seven inspectors) had the resources to monitor fire hazards at some fifty separate schools as proposed along with its numerous other duties.

### III.

All told, then, on the record before us this court cannot substitute its judgment for the heavily factual conclusion of the trial court that the actual and potential dangers of the roof work being performed substantially outweigh the adequacy of the measures proposed to counteract them. D.C.Code § 17–305(a) (1997). *See also Thompson v. Keohane,* —— U.S. ——, ——, 116 S.Ct. 457, 465, 133 L.Ed.2d 383 (1995); *United States v. Felder,* 548 A.2d 57, 61 (D.C.1988).

At the same time, our decision relates only to the trial court's orders of August 13 and 14, 1997. The decision is without prejudice to further applications by the parties to the trial court for modification of the injunction. In particular, it is not evident from the language of the orders that the trial court meant to bar all access to the affected schools by school administrators or staff to obtain materials and make limited preparations for the eventual school opening. And, as the roof work at individual schools nears completion, the trial court may decide that additional flexibility is appropriate. We rely

6. Furthermore, the trial court learned from the Chief Operating Officer at hearings begun the same day as its August 14 order "that asbestos and lead paint removal are simultaneously underway with the roof replacement project" since

in all events upon the good judgment of the trial court, which is uniquely familiar with this case and has sought conscientiously to heed the voice of the experts while not relinquishing the duty this lawsuit has imposed on it to insure the safety of school inhabitants.

The court, therefore, affirms *sua sponte* the orders in question.

*So ordered.*

these "are substances found in the roofs" (Order of August 18, 1997). At oral argument the parties did not dispute the accuracy of this information or the legitimacy of our relying on it in reviewing the trial court's decision.